## CULLEY *v.* CULLEY.

1. DIVORCE—CRUELTY—EVIDENCE.

    Testimony pro and con in a suit for divorce tending to show a miserly disposition on the part of the husband, and harsh or cruel treatment, *held*, to warrant a decree for the complainant wife.

2. SAME—PRESUMPTIONS—WITNESSES.

    Where the questions involved in a suit for divorce are questions of fact and the witnesses are greatly at variance as to the circumstances, the opportunity to observe their bearing and manner upon the witness stand is of great importance, and before reversing a decree the Supreme Court must be fully persuaded that it would necessarily have reached a different conclusion had it occupied the position of the court appealed from and been favored with all the advantages of that court for judging rightly.

Appeal from Jackson; Parkinson, J. Submitted June 8, 1915. (Docket No. 1.) Decided December 22, 1915.

Bill by Estella Culley against James Culley for divorce. From a decree for complainant, defendant appeals. Affirmed.

*Forrest C. Badgley* and *James J. Noon,* for complainant.

*Wilson & Cobb,* for defendant.

PERSON, J. The parties to this suit for divorce were married in the year 1886, and have one child, a son, who was about 23 years old when the bill of complaint was filed. The defendant is a farmer, and owned a small farm at the time of the marriage. Since then he has several times exchanged farms, or sold and purchased anew, each time getting a larger and better one,

until he now owns upwards of 200 acres, and has considerable personal property, with money in the bank.

The charges against the defendant, made by the wife in her bill of complaint, are, in substance, that he yet is, and ever has been, miserly in his conduct; that he has refused, or failed, to properly furnish her with the conveniences of life; that he has caused her to work beyond her strength, and that he has treated her otherwise in a harsh and cruel manner. She avers that he has never furnished her with more than one dollar in money since their marriage, and, as further illustrating the character of his treatment, that he has never bought for her any article of clothing, except upon one occasion when he brought her a second-hand pair of shoes that had cost him 50 cents. She also alleges that at various times he has called her "a damned bitch;" and that, prior to her leaving him, he had not spoken to her during a period of about 3 years.

In his answer the defendant either explicitly denies each charge made by complainant, or makes an explanation showing that the fault was with her. He avers that he not only gave to the complainant money from time to time, but that she had the privilege of purchasing what she wished upon his credit. He charges that she has not only been insolent and insulting in her talk and conduct, but vulgar in her language and actions for the purpose of annoying and humiliating him; and that for years she has neglected her home and absented herself therefrom at times when her services were the most needed; and he closes his answer with the statement:

"That he has for years been insulted, imposed upon and abused by the complainant, all of which he has borne without complaint, avoiding, so far as he was able to do so, everything calculated to arouse her disposition."

A considerable time was occupied by the hearing,

189 Mich.—32.

and a large amount of testimony was taken. The circuit judge filed a lengthy opinion, in which he stated in detail his findings of fact, and his reasons therefor. The complainant was given a decree of divorce with alimony, and the defendant appeals to this court.

It is very evident that the contradictory testimony of the parties goes, either upon the one side or the other, or upon both sides, beyond mere mistake, or exaggeration. It is not possible that the particular allegations and denials can all be the result of merely faulty, memories. But out of the matters in dispute we think that certain facts are established.

The defendant is undoubtedly of a very close and miserly disposition. He testified:

"When I was around to my work my clothes would get ragged; didn't pay attention to them. When they wore out so they couldn't stay on I would put on some more, and kept right on working. I haven't bought so very many clothes. The suit I have got on now I have had about 12 years. It isn't worn out."

The court inquired about his recipe for making clothes last, and his answer was:

"Don't put them on, and you won't wear them out."

And when asked where he got the overcoat he was then wearing, he said:

"I got it of Fred Gilman; bought it second-hand. I gave him $4 for it. This makes the third winter I have worn it."

This economy by defendant in the matter of his own wearing apparel is not referred to as constituting a serious offense, although the wife complains that it was a source of humiliation to her. A proper economy is always a virtue. But there is some ground for inferring that the disposition of mind which has led defendant to such excessive saving in the matter of his own clothing, has very likely also led him to demand the

same economy from his wife and child, not only as to their clothing, but in all other things. It lends some countenance to the wife's charges.

She testifies:

"I told him he would have to get the groceries. I would have to go to the store for them, and I went to Thomas Pulver and told him when he wanted his pay he would have to notify Mr. Culley. I told defendant the groceries were being bought at Pulver's and he would have to pay for them. He said he would not pay for the groceries. I could get groceries the best way I could. He had no money to pay for groceries. To get them with my own money. I told him I had no money to get them with. I continued to buy groceries on credit; had them charged to defendant."

The defendant admits that there was some trouble over the groceries. He says:

"She hadn't said anything to me about buying goods at Pulver's store before going there. I first heard of it by Pulver's notifying me. Wrote me saying there was a bill or account there. I had never heard of it. I talked with her about it. Said I thought it was a poor way for her to run an account down there and I would rather pay for things as I went along. She said she was going to have groceries and I would have to pay for them and I did."

He claims that he was always willing to furnish groceries and to pay for them, but we are satisfied that there must have been grounds for the wife's complaint in this respect. These seems to be no apparent reason why she should have bought groceries on credit, against his objection, if he was willing to, and did, furnish money for that purpose. He says that he paid for the groceries which she bought on credit, because he supposed he had to.

He admits that he and complainant went for a long period of time without speaking with each other; and there was more than one such period of silence. He says that he refrained from talking to her, because

she would not talk with him. A Mrs. Morton testifies that she worked in defendant's family for about 15 weeks at one time when the complainant was ill in bed and under the doctor's care; and this witness says that the defendant never went into complainant's room during the entire period, nor made any inquiry as to complainant's condition. We are led to believe that the complainant had grounds for complaining of cruel treatment.

We have mentioned but few of the many charges and countercharges made by the parties on the witness stand, and have not attempted to state the results of the proofs in full. The complainant unquestionably had her faults, and was not without blame. We are satisfied, however, that the greater fault was with the defendant, and that his indifference, not only to his wife's comfort, but to her rights, was largely the cause of such conduct on her part as he complains of, so far as it took place. He says that he is in doubt whether her mind is right at all times. If he is in good faith about this, it makes his course all the more questionable and should excuse many of the things charged against her, if those things really occurred.

We cannot help but attach considerable importance to the testimony of the son. In many things he corroborates the testimony of the mother. He was subjected to a severe cross-examination, which led him into some inconsistencies; but, upon the whole, we are impressed with the belief that he intended to be truthful and fair.

The letters written by complainant are not to be justified, but we look upon them more as the utterances of an excited woman, trying to counteract what she believed were unfair methods on the part of the defendant, than as any attempt to tamper with witnesses. Taking the whole record together, they should not bar her right to relief.

In cases of this kind, where the questions before the

court are almost entirely as to the facts, and where the witnesses are so greatly at variance as to what has occurred, the opportunity to observe their bearing and manner upon the witness stand is very important, and, before reversing a decree, "the appellate tribunal ought to be fully persuaded that it must have reached a different conclusion had it occupied the position of the court appealed from and been favored with all the advantages of that court for judging rightly." In this case we are satisfied that the circuit judge came to the right conclusion as to its important features.

The decree is affirmed, with costs to the complainant, including a solicitor's fee of $100.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

This case having been submitted on briefs, without oral argument, was reassigned after the death of Justice MCALVAY.